NOT PRECEDENTIAL                                    (Doc. Nos. 8, 18)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____  :
                                          :
PINELANDS PRESERVATION                    :
ALLIANCE and MICHAEL                      :
PERLMUTTER,                               :
                                          :
                    Plaintiffs,           :
                                          :
          v.                              :        Civil No. 13-3873 (RBK/AMD)
                                          :
NANCY WITTENBERG, BOB MARTIN,             :        **OPINION**
DAVID FANZ, and JAYLIN                    :
HOLDINGS, LLC,                            :
                                          :
                    Defendants,           :
                                          :
_____  :

**KUGLER**, United States District Judge:

    The dispute in this case arises out of a permit, approved by the New Jersey Department of

Environmental Protection (the "NJDEP"), for the construction of a Wal-Mart shopping center in

the New Jersey Pinelands.

    Although Plaintiffs, Pinelands Protection Alliance (the "Alliance") and Michael

Perlmutter ("Perlmutter"),[1] appealed the issuance of these permits to the New Jersey Superior

Court, Appellate Division, they also filed suit in this Court seeking declaratory and injunctive

relief against the developer, Defendant Jaylin Holdings, LLC ("Defendant Jaylin"), as well as the

_____

[1] The Alliance "is a non-profit organization dedicated and working toward the environmental protection and
preservation of the New Jersey Pine Barrens and the adherence and compliance of development in the Pinelands to
appropriate environmental requirements and standards." (Am. Compl. ¶ 3.) Perlmutter owns property in the
vicinity of the Pinelands "and has an interest in the adherence of development in the New Jersey Pinelands to
appropriate requirements and standards." (Id. ¶ 4.)

individuals allegedly responsible for the permitting process governing development in the New Jersey Pinelands:  Nancy Wittenberg, Executive Director of the Pinelands Commission ("Defendant Wittenberg"); Bob Martin, Commissioner of the NJDEP ("Defendant Martin"); and David Fanz, Manager of the Bureau of Coastal Regulation within the NJDEP ("Defendant Fanz"), (collectively, the "Individual Defendants").

Currently before the Court are Defendants' Motions to Dismiss Plaintiffs' Amended Complaint.  (Doc. Nos. 8, 18.)  For the reasons set forth below, the Court will **GRANT** Defendants' motions.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

The Plaintiffs allege that the Individual Defendants failed to adhere to certain environmental statutes and regulations before granting a development permit to Defendant Jaylin.  To understand the nature of Plaintiffs' claims, an overview of the statutes and regulations protecting the Pinelands is necessary

### A.  The Relevant Statutory Schemes

In 1973, the State of New Jersey enacted the Coastal Area Facility Review Act, N.J. Stat. Ann. §§ 13:19-1 et seq. ("CAFRA"), (Am. Compl. ¶ 9), in an effort to protect New Jersey's coastal areas while simultaneously encouraging "the development of compatible land uses," N.J. Stat. Ann. § 13:19-2; see also id. § 13:19-5 (setting forth the types of developments that required permits issued pursuant to CAFRA).

Further, the NJDEP was given the authority to adopt rules and regulations to effectuate the purpose of CAFRA pursuant to New Jersey's Administrative Procedure Act, N.J. Stat. Ann.

---

[2] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the Plaintiff."  Accordingly, the following facts are taken from Plaintiffs' Amended Complaint.  See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008).

Case 1:13-cv-03873-RBK-AMD   Document 25   Filed 06/10/14   Page 3 of 29 PageID: 280

§§ 52:14B-1 et seq.  Accordingly, the NJDEP established a number of regulations and standards regarding the use and development of coastal resources "to be used primarily by . . . the [NJDEP] in reviewing permit applications under . . . CAFRA."  N.J. Admin. Code. § 7:7E-1.1; (see also Am. Compl. ¶ 9).

In 1978, the Federal Government enacted the National Parks and Recreation Act, 16 U.S.C. §§ 471 et seq. (the "NPRA"), which addressed conservation and national forests.  Section 471i of the NPRA, entitled "Pinelands National Reserve," designated 1,000,000 acres of the Pine Barrens in central New Jersey as the Pinelands National Reserve (the "PNR").  Id.  Pursuant to section 471i, the U.S. Secretary of the Interior was authorized to request that the Governor of New Jersey "establish a planning agency to create a Comprehensive Management Plan" ("CMP") for the PNR.  (Am. Compl. ¶ 10)  This CMP was to include at least "'a program for state and local government implementation of the [CMP] in a manner that will ensure the continued, uniform, consistent protection of this area . . . .'"  (Id. (quoting 16 U.S.C. § 471i(f)(8)).[3]

In 1979, New Jersey adopted the Pinelands Protection Act, N.J. Stat. Ann. §§ 13:18A-1 et seq. (the "PPA").  (Am. Compl. ¶ 11.)  Finding that,

> [the] pinelands area[4] comprises pine-oak forests, cedar swamps, and extensive surface and ground water resources of high quality which provide a unique habitat for a wide diversity of rare, threatened and endangered plant and animal species and contains many other significant and unique natural, ecological, agricultural, scenic, cultural and recreational resources; that the continued viability of such area and resources is threatened by pressures for residential, commercial and industrial development; that the protection of such area and resources is in the interests of the people of this State and of the Nation; that such protection will require the coordinated efforts of all relevant municipal, county, State and Federal agencies; that the Congress and President of the

[3] Plaintiffs cite this section as "471i(f)(7)," however, it is actually subsection (f)(8).

[4] "The 'Pinelands Area' is a slightly smaller area within the Pinelands National Reserve . . . [that] was designated for State regulation by the Pinelands Protection Act of 1979 (N.J. Stat. Ann. §§ 13:18-1 et seq.)."  N.J. Admin. Code § 7:7E-3.44.

> United States have demonstrated a recognition of these facts through the enactment of section 502 of the "National Parks and Recreation Act of 1978," [16 U.S.C. § 471i]; and, that it is now necessary to implement the afore-cited Federal Act and insure the realization of pinelands protection through the establishment of a regional planning and management commission empowered to prepare and oversee the implementation of a [CMP] for the pinelands area.

N.J. Stat. Ann. § 13:18A-2; see also id. § 13:18A-11(a) (defining the boundaries of the "pinelands area"). The New Jersey Legislature also carved out an additional "preservation area" within the designated "pinelands area" that it identified as being especially vulnerable and thus in need of more stringent restrictions with regard to land development and use. Id. (discussing the creation of a "preservation area," which, as defined by section 13:18A-3, means that portion of the pinelands area designated by section 13:18A-11(b) of the PPA). The portion of the pinelands area not included within the "preservation area" was designated the "protection area." Id. § 13:18A-3.

In line with section 471i of the NPRA, the PPA also established the Pinelands Commission (the "Commission") as "the planning entity authorized in the [NPRA]" and stated that it "shall exercise all the powers and duties as may be necessary in order to effectuate the purposes and provisions thereof." Id. § 13:18A-4; (see also Am. Compl. ¶ 11). The Commission was tasked with preparing and adopting the CMP applicable to the pinelands area, with specific portions meant to address the preservation area and protection area. Id. § 13:18A-8. Subsequent to the adoption of the CMP, and its approval by the Secretary of the Interior in 1981, the Commission was authorized "to commence a review . . . of any application for development in the pinelands area." N.J. Stat. Ann. § 13:18A-15. As certain lands within the CAFRA area were also within the PNR (the "overlap area"), the regulations promulgated in furtherance of CAFRA, and later amended in light of the NPRA and PPA, provided that "[w]ithin the Pinelands National Reserve, the Pinelands Commission will serve as a reviewing agency for coastal construction

permit applications."  N.J. Admin. Code § 7:7E-3.44.  That same section also provided that the

NJDEP's Land Use Regulation Program and the Commission would coordinate the permit

review process through the procedure outlined in the February 8, 1988, Memorandum of

Agreement between the two agencies and any subsequent amendments to that agreement (the

"1988 MOA").  Id.

      Pursuant to the 1988 MOA, the NJDEP agreed to "implement the Pinelands [CMP]

within the coastal zone to the extent of its statutory authority."  Memorandum of Agreement

between N.J. Dep't of Envtl. Prot., Div. of Coastal Res. and N.J. Pinelands Comm'n (Feb. 8,

1988).[5]  Further, the NJDEP agreed that it would "review comments submitted by the [ ]

Commission on applications for development within the [PNR], and that it would consider the

Commission "to be a reviewing agency for any CAFRA permit applications affecting the

[PNR]."  Id.  The NJDEP also agreed to submit to the Commission certain certifications and

Wetlands and Waterfront Development permit applications involving the PNR for the

Commission's review and comment.  Id.  With regard to coastal land lying within the pinelands

area, the Commission and NJDEP agreed that both entities would "administer their respective

statutorily mandated permit and review functions."  Id.

      In sum, development in the smaller pinelands area is regulated by two state laws:

CAFRA and the PPA.  Both the Commission and the NJDEP administer their respective

regulations independently.  For proposed developments in CAFRA areas that are also within the

larger PNR, the NJDEP is responsible for reviewing permit applications and considers comments

---

[5] Although the 1988 MOA was not attached to Plaintiffs' Amended Complaint, it is properly considered by the
Court.  See Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted); see also
U.S. Express Lines, Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002) (stating that ordinarily, "a district court may
not consider matters extraneous to the pleadings," however, "a document integral to or explicitly relied upon in the
complaint may be considered without converting the motion to dismiss into one for summary judgment"); S. Cross
Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd., 181 F.3d 410, 426 (3d Cir.1999) (public documents
and prior judicial proceedings may be considered in deciding a motion to dismiss)

provided by the Commission.  According to Plaintiffs, the land at issue in this case on which Defendant Jaylin seeks to build a Wal-Mart is located in the overlap area, i.e., it is in a CAFRA area that is also within the PNR.

### B.  Defendant Jaylin's Application for Environmental Permits

"In September 2004, Defendant Jaylin [ ] submitted an application to the [NJDEP] Division of Land Use Regulation for a [CAFRA] permit and Freshwater Wetlands General Permit for the proposed development" of a Wal-Mart Superstore, garden center, and related accessory facilities on a 43-plus acre site in the PNR and overlap area (the "proposed Wal-Mart development").  (Am. Compl. ¶ 17.)  The Alliance and Perlmutter submitted documents and comments to the NJDEP opposing Defendant Jaylin's application complaining, inter alia, that it would adversely impact threatened endangered species, require the in-fill of wetlands, and that the proposed development violated certain CMP standards and CAFRA regulations.  (Id. ¶ 18.) As per the 1988 MOA, the NJDEP referred Defendant Jaylin's application to the Commission for review and comment.  (Id. ¶ 19.)

On January 10, 2005, the Commission issued a report that stated that the proposed Wal-Mart development was "'located within the federally designated [PNR]' and also in the CAFRA area," i.e., the "overlap area."  (Id. ¶ 20.)  The report noted further "that the application/development had a number of deficiencies and inconsistencies with the CMP and that the CMP prohibits development that results in 'irreversible adverse impacts on habitats that are critical to the survival of any local populations of threatened or endangered species' and the in-fill of wetlands, and that such impacts were caused by the [proposed Wal-Mart development]." (Id.)  On June 1, 2006, the NJDEP "denied the CAFRA/Freshwater Wetlands Permit for the [proposed Wal-Mart development], citing impact upon endangered and threatened wildlife or

plant species habitat, critical wildlife habitat, and in-fill of wetlands as being prohibited." (Id. ¶ 21 (internal citations omitted).) Defendant Jaylin then filed an administrative appeal with the NJDEP. (Id. ¶ 22.)

On October 22, 2009, Defendant Jaylin submitted a second CAFRA and Freshwater Wetlands Permit application to the NJDEP, which included modifications to the proposed Wal-Mart development. (Id.) This modified proposal aimed to mitigate adverse impacts on the habitat of the Pine Snake by designating a portion of the development site that would remain in its natural state, and by constructing new habitats to mitigate issues stemming from the in-fill of certain wetlands. (Id. ¶ 23.) Defendant Jaylin also proposed to add two vacant offsite properties as part of its development initiative. (Id. ¶ 24.) These properties would be reserved by conservation easements "to offset the adverse impact or destruction of the active Pine Snake habitat/hiberneum and in-fill of wetlands on the development site," and would be accompanied by Pine Snake-related habitat enhancements. (Id.) One of the mitigation properties, an 89-acre parcel, is located in the PNR, but not in the overlap area.[6] (Id. ¶ 25.)

On March 15, 2010, the NJDEP again denied Defendant Jaylin's application explaining that the revised proposed Wal-Mart development was, inter alia, still in "noncompliance with the endangered or threatened wildlife or plant species habitat rules and requirements."[7] (Id. ¶ 26.) Defendant Jaylin "again filed for an administrative appeal of that Permit Denial and requested an adjudicatory hearing." (Id. ¶ 27.) In the interim, Defendant Jaylin and the NJDEP held private negotiations pursuant to N.J. Admin. Code § 7:7-5.4,[8] during which Defendant Jaylin "proposed

---

[6] It is unclear which exact "area" this property falls into.

[7] Plaintiffs do not clarify whether the NJDEP found that Defendant Jaylin's application was out of compliance with the CMP, or whether it was out of compliance with another regulatory scheme.

[8] This provision provides: "Any applicant who has requested a hearing on a permit decision or has had a permit decision contested by a third party pursuant to this subchapter may, at any time prior to rendering of an initial

7

to overcome the prohibited impacts on threatened or endangered species habitat" by adding more mitigation properties, which would bring the total mitigation property acreage to 192 acres.  (Id.) Defendant also noted that there would be "habitat enhancement improvements" on these parcels, which would "serve as a replacement for Pine Snake habitat destroyed on the proposed Wal-Mart development and mitigate the adverse impacts upon the on-site habitat . . . ."  (Id.)

Around June or July 2010, the NJDEP submitted Defendant Jaylin's second revised application to the Commission for its review and comment as to compliance with the CMP per the 1988 MOA.  (Id. ¶ 28.)  On July 23, 2010, the Commission's Environmental Coordinator issued a report "detailing a number of nonconformities and deficiencies under the CMP."  (Id.) Specifically, "the Report again confirmed that the development is 'within the federally designated [PNR],' that the development and filling of wetlands is inconsistent with the CMP and the proposed mitigation is not allowed, that on the information submitted the Commission could not determine whether the CMP rules as to impact on threatened or endangered species were being violated or met, and that the information submitted did not address CMP stormwater standards."  (Id.)  The report also noted that two of the proposed mitigation parcels were within the PNR, and thus an application would need to be submitted to the Commission prior to the NJDEP's grant of approval.  (Id.)

On December 1, 2010, Defendant Jaylin submitted another "revised permit application" to the NJDEP.  (Id. ¶ 29.)  On January 11, 2011, the NJDEP Division of Fish and Wildlife issued a report concluding that the destruction of the Pine Snake "habitat/hiberneum on the [proposed Wal-Mart development] site could be offset under a newly formulated 'Habitat Evaluation Methodology' analysis by the preservation and enhancement proposed on the six 'mitigation'

_____

decision by the Office of Administrative Law, submit a revised application for the purpose of negotiating a settlement."  N.J. Admin. Code § 7:7-5.4.

8

properties." (Id. ¶ 30.)  The next day, a Notice of Intent to Settle was published in the NJDEP

Bulletin and sent to various interested parties including the Alliance and Perlmutter.  Plaintiffs

again submitted a "substantial number of written comments and objections." (Id. ¶ 31.)

On April 18, 2012, Defendant Fanz issued a CAFRA and Freshwater Wetlands permit for

the proposed Wal-Mart development (the "April 2012 Permit"), accompanied by an

Environmental Report and "Response to Public Comments," which stated that the proposed Wal-

Mart development was in compliance with appropriate regulatory standards. (Id. ¶ 32.)  The

Plaintiffs allege that the NJDEP's "Permit Approval" and "supporting documents" do not

mention that the proposed Wal-Mart development is in the PNR, nor do they reference

"compliance with CMP Standards and Regulations." (Id. ¶ 33.)  Rather, Defendant Franz notes

in his "Response" setting forth the NJDEP's position that "the analysis and Permit issuance was

premised upon the finding that 'the project location is not within the [PNR], but in the Pinelands

Management Area.'"[9] (Id.)

---

[9] The permit states in full:

As discussed in comment no. 4 above, the project location is not within the Pinelands National Reserve, but in the Pinelands Management Area. Specifically, the project site is located within the Pinelands Regional Growth Area. In Regional Growth Areas, the Department solicits comments from the Pinelands Commission, but the Commission defers to the Department for final decision.

CAFRA, Freshwater Wetlands GP #6 Permit Application, File No. 1500-04-0001.1 APL08080001 (N.J. Dep't of Envtl. Prot. Apr. 18, 2012) (final approval).  This document is properly considered by the Court in inquiring into its jurisdiction.  See note 5 supra.  By way of background, and as defined in the CMP, Regional Growth areas are:

areas of existing growth or lands immediately adjacent thereto which are capable of accommodating regional growth influences while protecting the essential character and environment of the Pinelands, provided that the environmental objectives of Subchapter 6 are implemented through municipal master plans and land use ordinances.

N.J. Admin. Code § 7:50-5.13(g).

### C.  Procedural History

On June 4, 2012, Plaintiffs appealed the NJDEP's issuance of the April 2012 Permit to the New Jersey Superior Court, Appellate Division.[10]  (Id. ¶ 36 (citing Docket A-4880-11T2).)  As far as the Court is aware, this appeal is currently pending.  (Id.)

On June 19, 2013, Plaintiffs filed a civil action in this Court against Defendant Jaylin, the Commission and the NJDEP.  (Doc. No. 1.)  When the Commission and the NJDEP moved to dismiss Plaintiffs' Complaint for lack of jurisdiction, (Doc. No. 4), Plaintiffs filed an Amended Complaint, replacing the Commission and the NJDEP with Defendants Wittenberg, Martin, and Fanz.  (Doc. No. 6.)  Plaintiffs allege in their Amended Complaint that their action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201 (the "DJA"), "the Constitution of the United States of America, specifically the Supremacy Clause, U.S. Constitution Article VI, Clause 2," and the NPRA.  (Am. Compl. ¶ 1.)  Accordingly, Plaintiffs claim that this Court has jurisdiction over their civil action by virtue of 28 U.S.C. § 1331.

On September 18, 2013, Defendant Jaylin moved to dismiss Plaintiffs' Amended Complaint.  (Doc. No. 8.)  And on October 29, 2013, the Individual Defendants filed a Motion to Dismiss, (Doc. No. 18), which remains unopposed.[11]  Finally, on February 7, 2014, the Court dismissed the NJDEP and Commission's motion to dismiss as moot.  (Doc. No. 24.)

---

[10] The permit specifies that in accordance with N.J. Admin. Code § 7:7A-1.7, "any person who is aggrieved by [the NJDEP's] decision may request a hearing within 30 days after notice of the decision is published in the DEP bulletin by writing to the" New Jersey Department of Environmental Protection, Office of Legal Affairs.  CAFRA, Freshwater Wetlands GP #6 Permit Application, File No. 1500-04-0001.1 APL08080001 ¶ 10; see also N.J. R. App. R. 2:1 to 2:15 (governing appeals to the New Jersey Superior Court, Appellate Division).

[11] Although Plaintiffs did not formally oppose the Individual Defendants' Motion to Dismiss, the Court will still address the merits of Plaintiffs' claims as to those Defendants.  "To do otherwise would dismiss the plaintiff[s'] claims for failure to adhere to a local court rule rather than for failure to state a claim upon which relief could be granted."  See Regal-Pinnacle Integrations Indus., Inc. v. Philadelphia Indem. Ins. Co., No. 12-5465, 2013 WL 1737236, at *4 (D.N.J. Apr. 22, 2013) (citing Stackhouse v. Mazurkiewiz, 951 F.2d 29, 30 (3d Cir. 1991)).

## II.     JURISDICTION

"Supreme Court precedent establishes that the Supremacy Clause creates an independent right of action where a party alleges preemption of state law by federal law."  Lewis v. Alexander, 685 F.3d 325, 346 (3d Cir. 2012), cert. denied, 133 S. Ct. 933 (2013) (citing Shaw v. Delta Air Lines, 463 U.S. 85, 96 n. 14 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is preempted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve"); see also St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S.V.I., 218 F.3d 232, 240 (3d Cir. 2000) ("[A] state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption . . . . The Supreme Court has recognized that such a challenge presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.").[12]

Here, Plaintiffs allege that Defendants Martin and Fanz issued a permit to Defendant Jaylin for the development of property in the PNR which failed to comply with the CMP and the requirements of the NPRA, and thus the April 2012 Permit is "preempted and precluded by Federal Law."  (Am. Compl. ¶ 8.)  Because Plaintiffs at least allege that the conduct at issue here is preempted by federal law, this Court has power to consider the merits of that allegation.  See Lewis, 685 F.3d at 346.

---

[12] In Lewis v. Alexander, 685 F.3d 325, 346 (3d Cir. 2012) cert. denied, 133 S. Ct. 933 (2013), the Third Circuit observed that in Douglas v. Independent Living Center of Southern California, 132 S. Ct. 1204 (2012), the Chief Justice, along with Justices Scalia, Thomas, and Alito disagreed with this principle and stated that "[w]hen Congress did not intend to provide a private right of action to enforce a statute enacted under the Spending Clause, the Supremacy Clause does not supply one of its own force."  Douglas, 132 S. Ct. at 1215 (Roberts, C.J., dissenting). The Third Circuit noted, however, that this view remained the minority view and until the Supreme Court abrogated Shaw v. Delta Air Lines, 463 U.S. 85 (1983), Shaw would remain binding precedent which the lower federal courts would follow.  Lewis, 685 F.3d at 346.

### III.  LEGAL STANDARD

Rule 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Phillips, 515 F.3d at 233).  In other words, a complaint is sufficient if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). It is not for courts to decide at this point whether the moving party will succeed on the merits, but "whether they should be afforded an opportunity to offer evidence in support of their claims."  In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).  Also, legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.

To determine whether a complaint is plausible on its face, courts conduct a three-part analysis.  Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).  First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Id. (quoting Iqbal, 556 U.S. at 675).  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Id. at 131 (quoting Iqbal, 556 U.S. at 680).  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."  Id. (quoting Iqbal, 556 U.S. at 680).  This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556

U.S. at 679.  A complaint cannot survive where a court can only infer that a claim is merely possible rather than plausible.  Id.

## IV.   DISCUSSION

Defendant Jaylin and the Individual Defendants have filed separate motions to dismiss. Defendant Jaylin moved to dismiss Plaintiffs' claims arguing that their Amended Complaint fails to state a claim upon which relief can be granted, that Plaintiffs' "preemption claim" fails as a matter of law, and that the Court should abstain from considering this action under Younger v. Harris, 401 U.S. 37 (1971) and Burford v. Sun Oil Co., 319 U.S. 315 (1943).

The Individual Defendants argue that the Amended Complaint as to them is barred by the Eleventh Amendment, that Defendants Martin and Fanz are entitled to qualified immunity as to Plaintiffs' claims against them in their personal capacities, and that the Amended Complaint fails to state a claim against Defendant Wittenberg in her personal capacity.  They also echo Defendant Jaylin's arguments that the Court should abstain from considering this matter under Younger and Burford.

The Court will first address abstention.

### A.  Defendants' Abstention Arguments

Defendants argue that the Court should abstain from adjudicating this matter under the Younger and Burford doctrines; however, Defendant Jaylin acknowledges in a recent letter to the Court that Younger abstention may no longer be appropriate in light of the Supreme Court's recent decision in Sprint Communications, Inc. v. Jacobs, 134 S. Ct. 584 (2013).  (See Doc. No. 23).  The Individual Defendants do not make a similar concession.

Plaintiffs argue that neither abstention doctrine applies.  In support of that argument, they contend that the NPRA requires the application of the CMP in the course of evaluating permit applications for proposed developments in the PNR, particularly in the overlap area that contains

the proposed Wal-Mart development, and that the Individual Defendants failed to do what was legally required.  According to Plaintiffs, this failure to apply the CMP in the course of approving the April 2012 Permit presents a preemption issue that this Court must resolve.

  1.  Younger Abstention

 "The federal courts have a virtually unflagging obligation" to adjudicate claims within their jurisdiction.  Deakins v. Monaghan, 484 U.S. 193, 203 (1988) (internal quotations and citations omitted).  An exception to that rule, however, was established in Younger, which held that federal courts should abstain when federal adjudication would disrupt an ongoing state criminal proceeding.  401 U.S. at 43-54.  This principle has been extended to "particular state civil proceedings that are akin to criminal prosecutions, or that implicate a State's interest in enforcing the orders and judgments of its courts."  Sprint, 134 S. Ct. at 588 (2013) (citing New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 368 (1989) (other internal citations omitted) ("NOPSI")).

In Sprint, the Supreme Court clarified the limits of the Younger doctrine, while reviewing its prior precedent in NOPSI and Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982) ("Middlesex").

First, the Supreme Court stated that Younger extends to the "three exceptional circumstances" previously identified in NOPSI, but no further.  Sprint, 134 S. Ct. at 593-94.  The exceptional circumstances included:  (1) federal intrusion into ongoing state criminal prosecutions, (2) certain "civil enforcement proceedings," and (3) "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  Id. at 591.

In reviewing <u>Middlesex</u>, the Supreme Court observed that courts that have divorced that case from its quasicriminal context have extended the <u>Younger</u> doctrine to apply when three conditions are met:  "(1) there is an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges."  <u>Sprint</u>, 134 S. Ct. at 593.  Accordingly, courts have incorrectly extended <u>Younger</u> "to virtually all parallel state and federal proceedings, at least where a party could identify a plausibly important state interest."  <u>Id.</u>  The Court noted that the "even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the exception, not the rule."  <u>Id.</u> at 593 (internal quotation marks omitted); <u>see also</u> <u>NOPSI</u>, 491 U.S. at 368 ("it has never been suggested that <u>Younger</u> requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.").

Based on this recent precedent, abstention under <u>Younger</u> would be inappropriate.  The appeal currently pending before the Superior Court of New Jersey, Appellate Division does not fall within the three exceptional circumstances identified in <u>NOPSI</u>.  Further, because "federal courts are obliged to decide cases within the scope of federal jurisdiction" and "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter," <u>Sprint</u>, 134 S. Ct. at 588, the Court will decline to apply the <u>Younger</u> doctrine to this matter.

2.   <u>Burford Abstention</u>

The doctrine of <u>Burford</u> abstention seeks to ensure that federal courts maintain the "proper regard for the rightful independence of state governments in carrying out their domestic policy."  <u>Burford</u>, 319 U.S. at 318.  Under this doctrine,

> [w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: 1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the results in the case then at bar;" or 2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

NOPSI, 491 U.S. at 361 (quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 815-816 (1976)).  "While Burford is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy."  Id. at 362 (quoting Colorado River, 424 U.S. at 815-816).  However, "a claim of federal preemption in and of itself, is not entitled to more deferential treatment than other constitutional claims in the face of an abstention challenge."  Hi Tech Trans, LLC v. New Jersey, 382 F.3d 295, 306 (3d Cir. 2004) (quotation omitted).

This case involves several comprehensive state statutory and regulatory schemes governing development in the PNR.  Plaintiffs argue, however, that the Court is presented with a federal concern and thus abstention is not appropriate.  Although Plaintiffs may be correct, the issue the Court must resolve is whether addressing this federal concern will require the Court to wade into New Jersey's statutory and regulatory schemes, and expound upon an area of law that the Third Circuit and Supreme Court have said is traditionally an area of local concern.  See Rucci v. Cranberry Twp., 130 F. App'x 572, 577 (3d Cir. 2005) (citing Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 135-36 (3d Cir. 2002) ("land use law is one of the bastions of local control, largely free of federal intervention")); see also FERC v. Mississippi, 456 U.S. 742, 768 n.30 (1982) ("regulation of land use is perhaps the quintessential state activity"); Izzo v. Borough of River Edge, 843 F.2d 765, 769 (3d Cir. 1988) ("Land use policy customarily has

16

been considered a feature of local government and an area in which the tenets of federalism are particularly strong.").

In considering <u>Burford</u> abstention in a case with a federal question, three criteria should be present before a District Court decides to abstain:  (1) the subject of the regulation is of significant and special concern to the state; (2) the state regulatory scheme is detailed and complex; and (3) the federal issues are unresolvable without requiring the district court to immerse itself in the technicalities of the state's scheme.  <u>Izzo</u>, 843 F.2d at 769.

Although the Court is quite sensitive to New Jersey's efforts to establish a comprehensive review system related to the issuance of development permits in the PNR and other protected areas, the Court does not believe that addressing the merits of Plaintiffs' preemption claims will disrupt those efforts, or require the Court "to become enmeshed" in New Jersey's statutory and regulatory schemes.  <u>Id.</u>  Indeed, in evaluating whether the Individual Defendants failed to consult the CMP in connection with Defendant Jaylin's permit application, the Court's analysis will focus on the purpose behind the NPRA, its scope, and whether it mandates the application of the CMP for developments in the PNR.  To answer these questions, the Court need not determine difficult issues of state law bearing on policy problems of substantial public import, i.e., environmental protection, PNR oversight, and land use, but rather if, how, and to what extent the NPRA preempts certain of the Individual Defendants' actions.  Accordingly, the Court declines to abstain under the <u>Burford</u> doctrine.  <u>Contra.</u> <u>Cummings v. Jackson</u>, No. 07-4046, 2008 WL 2625223, at *3-4 (D.N.J. June 30, 2008) (holding that <u>Burford</u> abstention applied where Plaintiff challenged the NJDEP's application of state statutes and regulations, including CAFRA and the New Jersey Freshwater Wetlands Protection Act, because "a review . . . would disrupt New Jersey's statutory and regulatory scheme for freshwater wetlands, which is comprehensive and

17

complex, and frustrate its efforts to have a coherent policy in areas of substantial public concern").

### B.  Plaintiffs' Claims Against the Individual Defendants

In Counts One and Two of the Amended Complaint, Plaintiffs seek declaratory and injunctive relief as to the NJDEP's issuance of a CAFRA and Freshwater Wetlands Permit to Defendant Jaylin.  Count One focuses on New Jersey's permitting process, as applied to Defendant Jaylin, as a whole.  Specifically, Plaintiffs allege that the NJDEP's "issuance of a Permit for the development of property in the [PNR] by [ ] Defendants Martin and [ ] Fanz as [NJDEP] officials fails to comply with the [CMP], and the requirements of the [NPRA] as to property within the [PNR], and is preempted and precluded by Federal Law."  (Am. Compl. First Count ¶ 8.)

Comparatively, Count Two concentrates on Defendant Jaylin's inclusion of certain mitigation properties in its proposed Wal-Mart development as well as its intended "improvements" to those properties.  Plaintiffs allege that although these mitigation properties are located in the State Pinelands Area,[13] and thus require the Commission's approval prior to the issuance of a development permit, the NJDEP issued a permit to Defendant Jaylin without the Commission's involvement as required by the CMP and requirements of the NPRA.  (Am. Compl. First Count ¶¶ 3-7.)

Although Plaintiffs do not specifically reference Defendant Wittenberg in Counts One and Two, they allege earlier that "[she] [ ] failed to comply with her legal responsibilities by

---

[13] Plaintiffs do not clarify whether they mean the smaller "pinelands area" set forth in the PPA, or some other area designated in that Act.

allowing development not in compliance with the CMP and failing to intercede in and/or prevent said development."  (Id. ¶ 35.)

Plaintiffs seek declaratory and injunctive relief against the Individual Defendants in their official capacities.[14]  Specifically, they ask that the Individual Defendants "be enjoined from doing or allowing any further actions and/or removal of conditions in furtherance of said invalid Permits or the perfection of said invalid Permits."  (Id. First Count ¶ 9, Second Count ¶ 9.)

      1.  Eleventh Amendment Immunity

Ordinarily, "states—and, by extension, state agencies and departments and officials when the state is the real party in interest—[are] generally immune from suit by private parties in federal court" pursuant to the Eleventh Amendment.  Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 323 (3d Cir. 2002).  However, Eleventh Amendment immunity is subject to three exceptions:  "(1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law."  Id. (citation omitted).

The third exception—and the only one that arguably applies here—is the doctrine of Ex parte Young, 209 U.S. 123 (1908).  As the Third Circuit has explained,

> the theory behind Young is that a suit to halt the enforcement of a state law in conflict with the federal constitution is an action against the individual officer charged with that enforcement and ceases to be an action against the state to which sovereign immunity

---

[14] Plaintiffs brought suit against the Individual Defendants in their official and personal capacities.  However, after considering the nature of Plaintiffs' claims—injunctive relief against the Individual Defendants for acts within their official capacities—it is apparent that Plaintiff has not set forth any allegations illustrating how the Individual Defendants acted in their personal capacities.  Thus, the Court need not address the Individual Defendants' arguments that they are entitled to "qualified immunity" for Plaintiffs' "personal capacity" claims, and this part of Plaintiffs' claims will be dismissed.  See Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310, 314 n.2 (3d Cir. 2002).

> extends; the officer is stripped of his official or representative character and becomes
> subject to the consequences of his individual conduct.

Hess, 297 F.3d at 323 (citing Young, 209 U.S. at 159-60; Pennhurst State Sch. and Hosp. v.

Halderman, 465 U.S. 89, 103 (1984) (explanatory parenthetical omitted)).  Simply, Young, seeks

to hold state officials "responsible to the supreme authority of the United States," and will apply

whether the alleged violation involves the United States Constitution or a federal statute.  Id. at

323-24 (citing Balgowan v. New Jersey, 115 F.3d 214, 218 (3d Cir. 1997) (holding that suit for

declaratory relief against state officer under Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq.,

is permissible under Young); Pennhurst, 405 U.S. at 105).

   "In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment

bar to suit, a court need only conduct a straightforward inquiry into whether the complaint

alleges an ongoing violation of federal law and seeks relief properly characterized as

prospective."  Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 645

(2002) (internal quotation marks and citation omitted).

   Here, Plaintiffs seek prospective relief related to future action in furtherance of the April

2012 Permit and allege that the Individual Defendants' conduct in approving that permit was

preempted by, and in violation of, the NPRA.  Thus, in situations like the one presented here,

i.e., where a federal statute directs a state to enact some comprehensive scheme, the question the

Court must answer is "whether the ongoing violations alleged are of federal or state law."  Hess,

297 F.3d at 324 (evaluating whether state official was entitled to sovereign immunity based on

allegations that his enforcement of certain portions of state surface coal mining program enacted

pursuant to federal act violated federal act).

        2.  <u>Plaintiffs' Preemption Claims</u>

"The doctrine of federal preemption is rooted in the Supremacy Clause of the United

States Constitution, U.S. Const. VI, cl. 2, which invalidates state laws that 'interfere with, or are

contrary to, federal law.'"  <u>Fellner v. Tri-Union Seafoods, L.L.C.</u>, 539 F.3d 237, 242 (3d Cir.

2008) (quoting <u>Hillsborough Cnty. v. Automated Med. Labs.</u>, 471 U.S. 707, 712 (1985)).  As the

Third Circuit has explained,

> [t]he Supreme Court has identified three major situations where there is preemption . . .
> (1) "express" preemption, applicable when Congress expressly states its intent to preempt
> state law; (2) "field" preemption, applicable when "Congress'[s] intent to pre-empt all
> state law in a particular area may be inferred [because] the scheme of federal regulation is
> sufficiently comprehensive" or "the federal interest is so dominant that the federal system
> will be assumed to preclude enforcement of state laws on the same subject;" and (3)
> "conflict" preemption, applicable when "state law is nullified to the extent that it actually
> conflicts with federal law," even though Congress has not displaced all state law in a
> given area.

<u>Id.</u> at 242-43 (citations omitted).

As an initial matter, Plaintiffs argue in their brief in opposition to the motion to dismiss

that:

> the Complaint alleges that the CAFRA and Freshwater Wetlands Act, and the DEP
> regulations and Permit authority under those Acts, have been preempted as to the area in
> the PNR, including the 'overlap' area subject to dual PNR and CAFRA authority, by the
> Federal Act and the regulations (the CMP) promulgated thereunder.[15]

(Pls.' Opp'n Br. 13.)  Not so.  The Amended Complaint actually states that it was the Individual

Defendants' failure to follow the CMP and NPRA in approving Defendant Jaylin's permit

application that violated and was "preempted" by federal law.  The Amended Complaint never

---

[15] As discussed <u>infra</u>, the CMP was promulgated under the PPA, a state statute, and not the NPRA.  <u>See</u> N.J. Admin.
Code § 7:50-1.2 ("This chapter is adopted pursuant to the Pinelands Protection Act, [N.J. Stat. Ann. §§] 13:18A-1 to
29, as amended by Laws of 1980, Chapter 65, adopted on July 10, 1980.").

asserts that the state statutes and regulations relied upon during the permitting process somehow ran afoul of federal law.  In other words, although Plaintiffs now appear to argue that certain state laws and regulations conflict with their federal counterparts, they failed to say so in their Amended Complaint.  But, even if Plaintiffs had alleged that the NPRA and CMP somehow preempted CAFRA, the Freshwater Wetlands Act, and the regulations promulgated under those statutes, those claims would still fail as a matter of law because none of the three "major situations" in which a state law is preempted by federal law is present here.

First, a state law may be "expressly" preempted when Congress expressly states its intent to preempt state law.  See Fellner supra.  In this case, however, the Plaintiffs fail to identify any portion of the NPRA, specifically section 471i, in which Congress "expressly" stated its intent to preempt New Jersey law.  Although the NPRA evidences a Congressional interest in protecting the New Jersey Pine Barrens, providing federal funding in furtherance of that interest, the statute is explicit that New Jersey is to bear the "primary responsibility" for protecting and preserving the PNR.  That "primary responsibility" is set forth in 16 U.S.C. §§ 471i(a)(3), (b)(2)-(3) wherein New Jersey, and not the Federal Government, will create a [CMP] by which the state will "assure orderly public and private development . . . ."  See also id. § 471i(b)(4) (the purpose of this section is to "to encourage and assist the State and its units of local government in developing a governmental mechanism to implement this comprehensive plan, and to provide Federal financial assistance for the acquisition of lands consistent with the comprehensive plan"); id. § 471i (d) ("[w]ithin thirty days after November 10, 1978, the Secretary of the Interior . . . shall request the Governor of the State of New Jersey to establish . . . a planning entity to develop a [CMP] for the Pinelands National Reserve . . . . The Secretary shall provide technical assistance and grants to the State for the development of the plan or revisions thereof.").

Second, a state law may also be preempted under the doctrine of "field preemption" if Congress's intent to pre-empt all state law can be inferred from a "sufficiently comprehensive" scheme of federal regulation or "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Fellner, 539 F.3d at 242-43. The Third Circuit has noted, "[c]ourts rarely find field preemption, especially in areas traditionally regulated by the states, unless the structure of a regulatory program leaves little doubt that Congress intended federal law to be exclusive in a particular field." Id. at 243 n.3; see also Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947) (stating that an occupied field is one in which the federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it"). Thus, "[t]he question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." Hillsborough Cnty., 471 U.S. at 714.

As discussed above, a plain reading of section 471i of the NPRA shows that Congress intended for New Jersey to manage the PNR through a CMP which was adopted on the state level. See Pinelands Comprehensive Management Plan, N.J. Admin. Code. § 7:50-1.2 (stating that "[t]his chapter is adopted pursuant to the Pinelands Protection Act, [N.J. Stat. Ann. §§] 13:18A-1 to -29). In the absence of a federal regulatory scheme governing this area, the Court concludes that Plaintiffs cannot state a field preemption claim. Contra. Ray v. Atlantic Richfield Co., 435 U.S. 151, 168 (1978) (finding field preemption of vessel regulations because "a state law in this area . . . would frustrate the Congressional desire").

Third, and finally, a state law may be preempted if it "conflicts" with a federal law "even though Congress has not displaced all state law in a given area." Fellner, 539 F.3d at 243. In

other words, "[c]onflict preemption exists where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 348 (3d Cir. 2001).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-73 (2000) (internal quotation marks, citation, and other punctuation omitted).

The purpose of section 471i of the NPRA is to encourage New Jersey to develop a plan for regulating development in the PNR, rather than impose an overriding federal conservation plan on the State.  See 16 U.S.C. § 471i(a) (stating that the NPRA "combines the capabilities and resources of the local, State and Federal Governments and the private sector and provides an alternative to large-scale direct Federal acquisition and management in cases where such acquisition and management is inappropriate" (emphasis added)).  And regulatory authority to implement the goals of the NPRA is left to New Jersey and its local governments.  See id. § 471i(g)(6).  As the state statutes and regulations here serve to further Congress's objectives as set forth in the NPRA, the Court concludes that Plaintiffs cannot state a conflict preemption claim either.

In sum, the Plaintiffs have failed to allege, much less show, that any state law or regulation at issue in this case is preempted by federal law.  Perhaps this is because our circuit court of appeals has already considered a challenge to the Secretary of the Interior's approval of the CMP and concluded that the District Court was correct in holding that the Secretary's approval was proper.  See Hovsons, Inc. v. Sec'y of Interior of U.S., 711 F.2d 1208, 1214 (3d Cir. 1983) (affirming District Court's opinion on the merits which granted summary judgment in the Secretary's favor on challenge to his approval of the CMP).

24

Instead, Plaintiffs' real bone of contention appears to be that the Individual Defendants failed to properly apply the CMP to Defendant Jaylin's application.  But that is simply a state-law question masquerading as a preemption challenge.  Notably, the NPRA provides no cause of action in instances where state nonconformance with the CMP is alleged.  Rather, as one might expect in the context of a federal bill enacted pursuant to Congress's Spending Clause power, the NPRA merely permits the Secretary of the Interior to withdraw federal funding should New Jersey fail to enact or obtain approval for the CMP, or should it fail to obtain approval for any subsequent revisions to the CMP.  Simply, there is no federal law at issue here such that Plaintiffs have stated a preemption claim.

### 3.   The Individual Defendants Are Entitled to Eleventh Amendment Immunity

The foregoing discussion shows that New Jersey's statutory and regulatory schemes are not preempted by the NPRA and that the Plaintiffs' Amended Complaint therefore alleges a violation of state, rather than federal law.  As a result, Eleventh Amendment immunity is appropriate here.  In reaching that conclusion, the Court finds instructive the Third Circuit's opinion in Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess, 297 F.3d 310 (3d Cir. 2002).

Hess addressed the interplay between the federal Surface Mining Control and Reclamation Act (the "SMCRA") and Pennsylvania's surface coal mining program, which was created pursuant to, and in accordance with, the SMCRA.  Plaintiffs brought suit against the Secretary of the Pennsylvania Department of Environment Protection alleging that he "failed to perform various nondiscretionary duties in connection with implementing, administering, enforcing, and maintaining" Pennsylvania's program.  Id. at 313-14.

In evaluating whether the Pennsylvania official was entitled to Eleventh Amendment immunity or whether the doctrine of Ex parte Young applied, the Third Circuit noted that the SMCRA was enacted to "ensure the viability of the surface coal mining industry and to promote federalism," and that the plain language of the statute "evidences Congress's intent to give the states exclusive jurisdiction over the regulation of surface mining as long as the states enact laws and regulations that, at a minimum, meet the minimum federal standards, with the federal standards serving only as the floor and not the ceiling for the state programs." Id. at 315-16. Accordingly, once a state developed a program in accordance with the SMCRA, and that program was approved by the Secretary of the Interior, the state would "be granted 'primary governmental responsibility,'"—and thus be considered a "primacy state"—"for regulating surface coal mining and reclamation operations." Id. at 316 (quoting 30 U.S.C. § 1253(a)). The state "would then have 'exclusive jurisdiction over the regulation of surface coal mining' within its borders." Id. (quoting 30 U.S.C. § 1253(a)). However, if a state failed to develop its own program or obtain approval for its program, jurisdiction over the regulation and control of surface coal mining in the state would then shift back to the Federal Government. Id.

In holding that the Pennsylvania official was entitled to Eleventh Amendment immunity, the Third Circuit concluded that although plaintiffs challenged the official's actions pursuant to an aspect of the Pennsylvania program they viewed as being in violation of the SMCRA, Pennsylvania's development of a state program pursuant to the SMCRA, and status as a primacy state, meant that regulation was a matter of state law. Id. at 324. Accordingly, after the Secretary of the Interior approved Pennsylvania's program, courts could only look to state law on matters involving the enforcement of the minimum national standards, id. 316-17 (collecting cases), and thus Eleventh Amendment immunity applied.

Here, in the absence of a violation of federal law, Plaintiffs' requested relief puts this case squarely within the Eleventh Amendment's bar to suit.  Even though the NPRA encouraged New Jersey to develop a CMP for the PNR, the CMP is still a state regulatory scheme and, like in Hess, an evaluation as to whether Defendants Martin and Fanz properly applied that scheme in issuing the April 2012 Permit necessary turns on an analysis of state law.

Accordingly, Plaintiffs' claims will be dismissed as against the Individual Defendants in their official capacities.  See Pennhurst, 465 U.S. at 121 ("a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment").

### C.  Plaintiffs' Claims as to Defendant Jaylin

Although Plaintiffs tend to focus on Defendants Fanz and Martin in their request for injunctive relief, they also seek to restrain "the defendants" from taking any actions in furtherance of the April 2012 Permit or in furtherance of the proposed Wal-Mart development. The Court assumes that this reference to "defendants" was intentional, such that they also seek to enjoin Defendant Jaylin from taking action in furtherance of the April 2012 Permit or the proposed Wal-Mart development.

Defendant Jaylin primarily argues that Plaintiffs' preemption claims fail as a matter of law because "preemption applies only to state law that conflicts with a federal statute or federal law" and "[n]o such conflict has been alleged" in the instant case.  (Jaylin Br. 10.)  As the foregoing discussion demonstrates, Jaylin is correct that there is no federal law at issue here. That notwithstanding, however, Defendant Jaylin's arguments are not really relevant to the Court's resolution of these particular claims.

Plaintiffs are asking the Court to enjoin construction of the proposed Wal-Mart development under the theory that the April 2012 Permit is invalid because it is in contravention of federal law.  As the Court already concluded, however, Plaintiffs have failed to allege that the Individual Defendants' actually violated federal law.  In light of this holding, it is difficult to see how a contrary conclusion could be reached as to Defendant Jaylin where it played no role in evaluating its own permit application in accordance with New Jersey's statutory and regulatory schemes and, as far as the Court is aware, simply applied for a permit which was subsequently approved.

Because there is no federal law at issue here, the April 2012 Permit's invalidity must be premised on a violation of state law, which Plaintiffs do not raise in their Amended Complaint, and which is not addressed by the Court.[16]  Presumably, if the April 2012 Permit was found to be invalid and void as a matter of state law, any future construction by Defendant Jaylin would violate whatever state provisions required the procurement of valid permits prior to construction. Nevertheless, in the absence of an adverse finding as to the validity of the April 2012 Permit based on the violation of federal law, there is no basis for this Court to provide injunctive relief with respect to Defendant Jaylin.

Accordingly, the Court will dismiss Plaintiffs' claims against Defendant Jaylin as well.

**D.  Leave to Amend**

"When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).

---

[16] Indeed, as discussed in Part IV.A.2 supra, an inquiry into the April 2012 Permit's validity based on state law would seem to invoke the concerns raised by the Court in connection with its Burford analysis.

Due to the pendency of Plaintiffs' appeal in the Superior Court, Appellate Division, and the possibility that this case truly turns on issues of state law more properly addressed by state administrative entities and state courts, the Court will not grant Plaintiffs leave to amend their Amended Complaint outright, but will permit them to file a motion for leave to amend their Amended Complaint to the extent that there is some other federal provision under which they might be entitled to relief.

The Court cautions Plaintiffs, however, that if they do file a motion for leave to amend, that they ensure their proposed Second Amended Complaint presents a federal issue that this Court can resolve without improperly examining New Jersey's administration of its statutory and regulatory schemes governing development in the PNR.  See Part IV.A.2 supra.

## V. CONCLUSION

Accordingly, for the reasons stated above, Defendants' motions will be **GRANTED**.  An appropriate order will issue today.


Dated:  6/10/2014                                      s/ Robert B. Kugler
                                                       ROBERT B. KUGLER
                                                       United States District Judge